1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    IVAN KILGORE,                        No.  2:11-cv-01745 TLN DB P

12                  Plaintiff,

13          v.                              FINDINGS AND RECOMMENDATIONS

14    GRANNIS, et al.,

15                  Defendants.

16

17          Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18    action under 42 U.S.C. § 1983 alleging medical staff and a correctional officer were deliberately

19    indifferent to his medical needs during his recovery from surgery in violation of the Eighth

20    Amendment.  Before the court is defendants' motion for summary judgment, which rejects

21    plaintiff's allegations of improper post-operative care and seeks judgment for defendants on all

22    claims.  (ECF No. 55.)  For the reasons outlined below, the undersigned respectfully recommends

23    that defendants' motion be granted and that judgment be entered in favor of all defendants.

24    **I.      Background**

25          **A.      Procedural**

26          Plaintiff is currently proceeding on his first amended complaint.  (ECF No. 12.)

27    Defendants filed a motion for summary judgment.  (ECF No. 55.)  Plaintiff opposes the motion.

28    (ECF No. 61.)  Plaintiff also objects to defendants' submission of two pieces of evidence, which

the court addresses below.  (ECF No. 61-2.)  Defendants filed a reply in support of their motion. (ECF No. 65.)  Plaintiff attempted to file a sur-reply, stating that defendants' reply brief raised new issues.  (ECF No. 67.)  However, the court denied that motion and struck the sur-reply from the record because plaintiff did not did not identify any new issues or arguments in defendants' reply brief that would necessitate such a filing.  (ECF No. 72.)  The summary judgment motion is now ripe for review.

### B.   **Factual**

#### 1.   **Plaintiff's Evidentiary Objections**

Before setting forth the factual background, the court will address plaintiff's objections to two pieces of evidence submitted in support of defendants' summary judgment motion.  (ECF No. 61-2.)  Plaintiff objects to two lines in the deposition of defendant Shirley Rigg (ECF No. 55-7 at 4: 2-3), to defendants' submission of plaintiff's deposition transcript (ECF No. 56-1), and to a paragraph of defense counsel's declaration concerning the deposition transcript (ECF No. 56). (ECF No. 61-2.)  For the following reasons, both of plaintiff's evidentiary objections are overruled.

First, plaintiff objects that as a nurse practitioner, and not a physician, defendant Rigg is unqualified to opine that Tylenol 3 with codeine is "an equally suitable alternative" to Vicoden. (ECF No. 61-2 at 1-2.)  The cases that plaintiff cites to support his argument though are inapposite.  Both Britton v. Colvin and Molina v. Astrue are appeals of administrative law decisions in the social security context.  Britton, 787 F.3d 1011 (9th Cir. 2015); Molina, 674 F.3d 1104 (9th Cir. 2012).  While the Ninth Circuit ruled that a nurse practitioner was not an acceptable source of a medical opinion unless working under a physician, it did so strictly pursuant to federal regulations guiding an administrative law judge's decision in a dispute over federal benefits.  Britton, 787 F.3d at 1013; Molina, 674 F.3d at 1111.  These regulations concern only what an administrative law judge may consider "acceptable medical sources" and how to weigh opinions from different medical professionals in the determination of benefits.  They do not apply to an evidentiary determination in federal court; here, the admission of evidence is

////

2

1   governed by the Federal Rules of Evidence, which place no such restrictions on nurse

2   practitioners.

3       The Federal Rules of Evidence allow the court to consider defendant Rigg's statement.

4   Defendant Rigg's duties as a nurse practitioner for CDCR include: "[i]dentifying and ordering

5   appropriate pharmacologic agents, adhering to the CDCR statewide formulary whenever

6   possible[.]"  (ECF No. 12 at 48.)  As plaintiff's allegations partially concern his objections to

7   defendants' choice of medications for his post-operative recovery, defendant Rigg's statement

8   that, in her opinion as a nurse practitioner who orders drugs for the prison pharmacy, Tylenol 3 is

9   an acceptable substitute to Vicodin is relevant.  See Fed. R. Evid. 404(a)-(b) ("Evidence is

10  relevant if . . . it has any tendency to make a fact more or less probable than it would be without

11  the evidence . . . and . . . the fact is of consequence in determining the action.")  Furthermore,

12  defendant Rigg's declaration is not submitted as an expert witness, so it is not subject to the same

13  type of scrutiny it would need to withstand pursuant to a Daubert challenge.  Daubert v. Merrell

14  Dow Pharma, 509 U.S. 579 (1993).  Thus, the court will consider defendant Rigg's personal

15  opinion that Tylenol 3 is a suitable substitute for Vicodin.  Plaintiff's objection is overruled.

16      Second, plaintiff challenges the submission of the transcript of his own deposition on the

17  grounds that it (1) is not certified per Federal Rule of Civil Procedure 30 and (2) is a

18  "misrepresentation to the court."  Both of these objections are overruled.

19      Local Rule 133 provides that deposition transcripts may not be filed on CM/ECF.  E.D.

20  Cal. Local Rule 133(j).  Instead, relevant sections of deposition transcripts must be filed as

21  exhibits to become an official part of the record.  Id.  Defendants submitted pertinent excerpts of

22  plaintiff's deposition and a declaration of defense counsel, Christine Ciccotti, affirming that the

23  excerpts are true and correct copies from the deposition transcripts.  (ECF Nos. 56; 56-1.)

24  Defendants separately lodged the full deposition transcript with the court pursuant to the Local

25  Rules.  (ECF No. 56.)

26      Plaintiff is correct the transcript copies and excerpts initially filed with the court were

27  uncertified.  However, upon plaintiff's objection, defendants corrected that error and lodged

28  certified copies of the deposition transcript with the court on July 19, 2016.  (ECF No. 66.)  The

3

1   court confirms that Rule 30-compliant, certified copies of plaintiff's deposition transcript have

2   been lodged with the court and routed to the undersigned's chambers.  Furthermore, the certified

3   copies are identical to the uncertified excerpts and full transcripts (except for the missing

4   certification page) filed with the motion for summary judgment.  Because certified copies have

5   been provided, defendant's objection pursuant to Rule 30 is now moot.

6          In addition to his objection concerning Rule 30, plaintiff claims that the transcript was

7   "doctored by defense counsel in an effort to omit material facts Plaintiff gave testimony to."

8   (ECF No. 61-2 at 3.)  This is a very serious accusation.  However, the accusation is submitted

9   with no evidentiary support besides plaintiff's naked allegations and the errata sheet that he

10  submitted with the objections.  (Id. at 3, 103-04.)  No material errors are evident in the errata

11  sheet either.  (Id. at 103-04.)  Rather, the corrections plaintiff made to the transcript are minor

12  typographical issues.  (Id.)  Furthermore, plaintiff has lodged this errata sheet with the court, so

13  the undersigned can take it into consideration during review of the summary judgment motion.

14         In addition to contesting the court's ability to rely upon the deposition transcript, plaintiff

15  also refers to Federal Rule of Civil Procedure 11 and suggests that the court impose serious

16  sanctions on defendants.  (Id. at 3.)  However, the court declines to do so as plaintiff has

17  inappropriately raised the Rule 11 challenge.  Rule 11 has very specific instructions for the filing

18  of sanctions motions.  See Fed. R. Civ. P. 11(c)(2).  This includes a "safe harbor" provision

19  requiring the movant to first serve a copy of the motion on opposing counsel to allow counsel to

20  correct the sanctionable conduct within 21 days.  This provision was not complied with, so the

21  court will consider plaintiff's arguments concerning Rule 11.

22         The court has authority to invoke Rule 11 on its own volition in appropriate

23  circumstances.  However, in this instance, from what has been put forth on the record (including

24  plaintiff's minor grammatical and typographical changes to the transcript in his errata sheet),

25  sanctions are not appropriate.  Plaintiff's simple allegation of malfeasance and the underlying

26  support of purported minor typographical errors in a transcript clear do not rise to the very serious

27  nature of a Rule 11 violation.  Thus, the court declines to impose sanctions on its own volition.

28  ////

4

1    Third, plaintiff objects that defendants' submission of paragraph 2 of counsel's

2    declaration, which attests to the submission of certified copies of the deposition transcript to the

3    court.  (ECF No. 61-2 at 4.)   As with the objection to the uncertified deposition transcripts and

4    excerpts, this too is moot because defendants corrected the error and submitted certified copies of

5    the transcript to the court.

6        As a final note, the court will still cite to the deposition excerpts filed on CM/ECF for ease

7    of reference.  These excerpts are identical to the certified copies lodged with the court, so all

8    references to those documents on the electronic record will also impliedly refer to the certified

9    paper copies lodged properly with the court.

10                    **2.**    **Statement of Facts**

11        The below statement of facts is derived from the parties' statements of undisputed facts,

12    oppositions to the statements of undisputed facts, the allegations in plaintiff's first amended

13    complaint, and all declarations, depositions and other records submitted on the record for the

14    court's consideration on this summary judgment motion.  (ECF Nos. 55-2; 55-3; 55-4; 55-6; 55-7;

15    56-1;[1] 56-2; 61-1; 61-2; 61-3; 61-4.)  The following facts are undisputed by the parties or,

16    following the court's review, have been deemed undisputed for purposes of the pending motion.

17        On several occasions in his response to the undisputed statement of material facts,

18    plaintiff asserts that a certain fact is disputed, but, in his explanation, does not actually dispute the

19    fact.  For instance, in defendants' statement of undisputed facts, they assert that on the day after

20    his surgery, a nurse dispensed Tylenol 3 to plaintiff shortly before he was discharged.  (ECF No.

21    55-2, ¶ 2.)  Plaintiff claims that this fact is disputed, but his dispute merely alleges that his

22    discharge evaluation by the treating physician was not thorough and that he argued with the

23    treating nurse that the Tylenol 3 would not be effective.  (ECF No. 61-1 at 4.)  That the nurse

24    dispensed Tylenol 3 to plaintiff is not actually disputed.  (Id.)

25    ////

26

27    [1]  ECF No. 56-1 is the citation record for the excerpts from plaintiff's deposition.  As the
      undersigned provided above, the court will look to the certified paper copies of the deposition
28    transcript that were filed with the court pursuant to Local Rule 133(j).

1    The court has reviewed plaintiff's statement of undisputed facts and his objections to

2    defendants' statement of facts in detail.  (ECF No. 61-1.)  Where it is clear that plaintiff's

3    "dispute" with a stated fact is merely an elaboration on the fact, the court will accept that the

4    initial fact stated by defendants is undisputed.  The court will, of course, consider plaintiff's

5    elaborations and explanations, as far as they are supported by evidence, and relevant; however,

6    the undersigned will not consider such situations to be a genuine "dispute" of defendants'

7    statement of facts.

8        Plaintiff is a prison inmate in the California Department of Corrections and

9    Rehabilitation's (CDCR) custody.  Plaintiff was housed at California State Prison - Sacramento

10   (CSP-Sacramento) at all times material to this case.  At all times relevant to this action,

11   defendants Okoroike, Mwai, Molina, and King were employed by CDCR at CSP-Sacramento as

12   Registered Nurses.  At all times relevant to this action, defendant Rigg was employed by CDCR

13   at CSP-Sacramento as a Nurse Practitioner.  At all times relevant to this action, defendant Auer

14   was employed by CDCR at CSP-Sacramento as a Correctional Officer.

15                    **a.   March 15, 2010**

16       On March 15, 2010, plaintiff underwent surgery at U.C. Davis Medical Center to excise

17   an inverted papilloma from the right side of his nose.  After the surgery, while at U.C. Davis,

18   plaintiff received morphine intravenously effectively controlling his pain.  On March 16, 2010,

19   approximately forty-five minutes to one hour before his discharge from U.C. Davis, the nurse

20   dispensed to plaintiff one tablet of Tylenol 3 for pain.  After the March 15, 2010 surgery the U.C.

21   Davis doctor issued Kilgore a prescription for one tablet of Tylenol 3 every four to six hours, as

22   needed for pain.  The U.C. Davis doctor also prescribed plaintiff Keflex, an oral antibiotic to

23   prevent infections from open wounds.

24                    **b.   March 16, 2010**

25       On March 16, 2010, plaintiff returned to CSP-Sacramento from U.C. Davis.  That same

26   day nursing intake in the prison's Treatment and Triage Area (TTA) saw plaintiff.  The intake

27   form notes plaintiff's allergies to prednisone, his blood pressure was 124/81, his temperature was

28   98 degrees, and he reported his pain as being an eight on a scale of one to ten.  The nurse noted

on the intake form that plaintiff received pain medications forty-five minutes ago, prior to departing from U.C. Davis.  The TTA nurse discharged plaintiff from the TTA to the Outpatient Housing Unit (OHU).  There, the nursing staff administered to plaintiff his first dose of Keflex at 19:00 and cleaned his wound at 20:00.

While in the OHU, nursing staff medicated Kilgore with one tablet of Tylenol 3 for pain at his incision site.  The nurse noted his pain would continue to be monitored.  While in the OHU, nursing staff issued plaintiff 4x4's, sterile gauze to use as dressing for his wound as needed.  At 14:30, the on-call doctor issued telephonic physician's orders for plaintiff mirroring the U.C. Davis prescription.  The on-call doctor ordered for plaintiff: (1) Tylenol 3, one tablet by mouth, every four hours as needed for pain for ten days; (2) Cephalexin (Keflex); (3) Hydrocortisone applied to the affected area two times daily for thirty days; (4) N130 applied to the affected area two times daily for thirty days; (5) Ocean nasal spray, a .65% solution applied to the affected area two times daily for thirty days; 6) Gas-X; 7) for plaintiff to be seen by the Medical Line in five days; 8) for plaintiff to keep the wound clean by using a solution of half strength hydrogen peroxide and half strength water; (9) for plaintiff to keep his head elevated at forty-five degrees as recommended by U.C. Davis.  The nursing staff noted these orders at 16:00 on March 16, 2010.  At approximately 20:00, plaintiff received his next dose of Tylenol 3, and continued to receive his pain medication throughout the morning hours of March 17, 2010.

### c.   March 17, 2010

After receiving Tylenol 3, plaintiff gained temporary relief, which allowed him to sleep for two or three hours that evening.  Plaintiff awoke in pain in the early morning hours of March 17, 2010, and informed the nursing staff.  The nursing staff provided him his prescribed pain medication, and he returned to sleep for at least two more hours.

Throughout the day on March 17, 2010, a nursing assistant visited plaintiff's OHU cell every thirty minutes.  Additionally, throughout the day, a nurse came to Kilgore's cell once per shift, and also to administer medications during pill call.  Nursing assistants would also take his blood pressure and temperature, see if there were any complaints, or if medical treatment was needed.  On March 16 and 17, 2010, Defendant Molina was assigned as a registered nurse to the

OHU on first watch.  First watch runs from 22:00 to 06:00 the following morning.  At 01:00,

defendant Molina noted that plaintiff had earlier complained about his scheduled medications.

Defendant Molina noted slight swelling to the right side of plaintiff's nose, the drainage under his

nose was in place, his sutures were intact, and plaintiff lay sleeping without apparent signs or

symptoms of acute distress.  At 04:20, defendant Molina provided plaintiff one tablet of Tylenol 3

for pain.  At 10:00 on March 17, 2010, plaintiff was alert and had taken his pain medication, one

Tylenol 3, at 09:15.

At 11:00 on March 17, 2010, defendant Nurse Practitioner Rigg completed a history and

physical examination of plaintiff.  Defendant Rigg noted that plaintiff was in the OHU for post-

operative care after receiving an open medial maxillectomy with rhinoectomy.  Defendant Rigg

noted that plaintiff had a past medical history of chronic allergic rhinitis, a past surgical history of

an endoscopic surgery on his sinuses in November 2006, and a previous right lateral rhinotomy

with medial maxillectomy.  Defendant Rigg noted plaintiff had an allergy to prednisone.

Defendant Rigg noted plaintiff denied having a history of chronic pain.  Defendant Rigg stated

plaintiff was alert, ambulatory in his cell, wanted to return to "C yard," wanted DSS for

constipation, was comfortable, and in no acute distress.  The suture line on his nose was intact

with no drainage, but slight swelling.  Defendant Rigg noted a history of a reoccurrence of a

papilloma in plaintiff's right maxillary sinus.  Defendant Rigg noted plaintiff's treatment plan in

the OHU for post-operative care per the U.C. Davis Otolaryngology orders as follows: (1) Keflex

500 milligrams four times daily; (2) Ocean nasal spray; (3) dry sterile dressing to be cleansed

with 50% hydrogen peroxide solution; (4) head of bed to be elevated at forty-five degrees; (5)

Tylenol 3, one tablet every four hours as needed for pain; and (6) DSS 200 milligrams twice

daily.  At 12:30, defendant Rigg issued orders for plaintiff to receive 100 milligrams of docusate

sodium (DSS), two tablets by mouth two times daily for thirty days.

At 13:50, plaintiff was given one Tylenol 3 for pain.  At 17:50, plaintiff requested pain

medication for discomfort to the right side of his face.  The area was swollen, but the sutures were

clean and dry with some redness but there was no drainage.  Plaintiff was given a solution to

clean his wound, and one Tylenol 3 for pain.  At 19:30, plaintiff stated to the nurse conducting

rounds that he fell asleep and the pain subsided for about one and a half hours, but at that time his pain was an eight of ten.  The nurse on shift called the on-call doctor at 20:20 and 20:50 to advise him the Tylenol 3 was not providing plaintiff pain relief for four hours.  At 20:00, plaintiff's blood pressure was 145/92 and his temperature was 98.9 degrees.  At 21:45, nursing staff administered plaintiff one Tylenol 3 tablet for pain.

At 22:45, the on-call doctor issued telephonic physician orders increasing plaintiff's dosage of Tylenol 3 to two tablets every six hours as needed for pain for three days for incisional pain.  The nurses on shift noted this order at 22:45, and defendant Molina again noted it on his first watch shift on March 18, 2010.  As a result of the on-call doctor's orders, plaintiff's prescriptions were increased from one to two tablets of Tylenol 3 to address his complaints of pain.  Plaintiff slept that evening until approximately 02:00.  On March 17, 2010, the prison's nursing staff administered to plaintiff all pain medications as prescribed.

### d.  March 18-19, 2010

On March 18-19, 2010, defendant Molina was assigned as a registered nurse on first watch in the OHU.  At approximately 01:00, defendant Molina visited plaintiff's OHU cell.  Defendant Molina noted plaintiff's earlier complaints of ineffectiveness of his pain medication and that the medical officer on duty was notified of plaintiff's complaint. Defendant Molina noted the physician's order increasing and changing the frequency of plaintiff's pain medications and that plaintiff had been medicated per the physician's order.  Defendant Molina later noted that the medication was apparently effective and that plaintiff then appeared to be sleeping without interruption.

At 08:00, plaintiff's blood pressure was 137/67 and his temperature was 98.3 degrees.  At 09:50, plaintiff took his medication, but expressed a little concern about them.  The nurse noted plaintiff would continue to be monitored.  At 12:40 on March 18, 2010, the on-call doctor issued telephonic physician's orders to provide plaintiff fifteen milligrams of immediate release morphine by mouth one time for postoperative pain.  Nursing staff provided plaintiff this medication.  At 16:28, the on-call doctor issued revised telephonic physician's orders for plaintiff.  The doctor discontinued the prior order of Tylenol 3, and instead ordered plaintiff to receive two

1   Tylenol 3 tablets by mouth every six hours as needed for pain for three days.  The nurse on duty

2   noted these clarifying orders.

3       At 20:00, plaintiff advised the on duty nurse that his pain was more controlled that day

4   and the nurse reviewed his pain medications with him.  The nurse noted plaintiff's sutures were

5   intact with redness, fluids were encouraged, he was provided the DSS as ordered, and that he

6   would continue to be monitored.  At 20:00, plaintiff received two Tylenol 3 tablets for facial

7   incision pain.  The nurse noted that plaintiff's pain was a seven on a scale of one to ten.  At 21:30

8   plaintiff's pain subsided.  On March 18, 2010, plaintiff received all prescribed pain medication.

9   Plaintiff slept until approximately 02:00 that evening/early morning.

10      On March 18-19, 2010, defendant Okoroike was assigned as a registered nurse to the

11   OHU on first watch.  At approximately 01:00, defendant Okoroike visited plaintiff's OHU cell.

12   She noted plaintiff was quiet in his cell, able to wake, and medicated as scheduled.  Defendant

13   Okoroike noted that plaintiff had been administered Simethicone as ordered.  Plaintiff had no

14   complaints of pain at that time.  She observed the stitches to his nose intact and saw no signs or

15   symptoms of infection.  At 02:00, plaintiff said his pain level was six out of ten to his nose area.

16   Defendant Okoroike provided him with two tablets of Tylenol 3 and noted he would be monitored

17   for the pain medication's effectiveness.  At 03:00, defendant Okoroike noted that plaintiff lay

18   resting quietly in bed and in no apparent distress.  She noted that plaintiff stated the pain

19   medication was helpful and he would continue to be monitored.  At 08:00, plaintiff's blood

20   pressure was 146/92 and his temperature was 98.7 degrees.

21      On March 19, 2010, defendant King was assigned as a registered nurse to the OHU during

22   second watch.  Second watch runs from 06:00 to 14:00.  At approximately 09:00, defendant King

23   visited plaintiff's OHU cell.  At that time plaintiff was alert, awake, and oriented.  Defendant

24   King noted plaintiff's agitation.  He stated to her: "I'm supposed to get my Tylenol 3 at 08:00,

25   you've kept me waiting one hour."  Defendant King advised plaintiff that the orders for his

26   Tylenol 3 were as needed for pain, and the nursing staff had not been notified he was requesting

27   the medication.  Defendant King's notes in the nursing care record reflect that plaintiff then was

28   quiet although still appeared agitated based upon furrowing of his brow and clenching of his jaw.

10

Defendant King took plaintiff's blood pressure and recorded it as 146/92, which she attributed to his agitated state, and indicated she would re-check it a noon.  Plaintiff complied with his medications and took two tablets of Tylenol 3 for his complaints of nasal pain.  Defendant King saw no signs or symptoms of infection at the surgical site.  At the conclusion of defendant King's distribution of medication to all patients in the OHU, she noted plaintiff had no further complaints of pain and was not in distress.  At 10:15, defendant King noted plaintiff was resting quietly.

At 13:45, defendant Nurse Practitioner Rigg ordered plaintiff one bottle of magnesium citrate.  Magnesium citrate is a laxative.  Defendant King noted defendant Rigg's order.

On March 19, 2010, defendant Mwai was assigned as a registered nurse to the OHU during third watch.  Third watch runs from 14:00 to 22:00.  At 15:20, defendant Mwai provided plaintiff two tablets of Tylenol 3 for complaints of a pain level six out of ten.  At approximately 17:10, defendant Mwai again visited plaintiff's cell.  At that time plaintiff was awake, alert, and denied distress.  Defendant Mwai provided plaintiff Tylenol 3 for pain, and observed no signs of infection.  At 21:30, defendant Mwai provided plaintiff two tablets of Tylenol 3 for complaints of a pain level of eight out of ten.  At 22:00, defendant Mwai noted plaintiff lay resting.

On March 19-20, 2010, defendant Okoroike was assigned as a registered nurse to the OHU during first watch.  At approximately 23:00, defendant Okoroike visited plaintiff's cell.  At that time, plaintiff stood at his cell door and stated that his pain medication was not working.  Defendant Okoroike advised plaintiff he already received two tablets of Tylenol 3 at 21:30.  Plaintiff responded that he wanted more medication.  Defendant Okoroike advised plaintiff to discuss his concerns with the doctor in the morning.  She noted that plaintiff was upset and agitated with her response.  Plaintiff then refused the 500 milligrams of Keflex at 23:00.  On March 19, 2010, the prison's nursing staff administered to plaintiff all prescribed pain medications.

### e.   March 20, 2010

At 04:30 on March 20, 2010, defendant Okoroike noted that plaintiff lay resting quietly in his bed but was easily aroused.  She provided him two Tylenol 3 tablets due to his complaints of a pain level of six out of ten.  At 05:30, defendant Okoroike noted plaintiff was calm in bed with no

1   further complaints of pain or acute distress.  Plaintiff claims that he was in bed in a great deal of

2   pain at this time.  At 08:00, plaintiff's blood pressure was 137/92 and his temperature was 97.6

3   degrees.

4   In "disputing" to this fact, plaintiff does not actually address the blood pressure and

5   temperature readings.  Instead, he provides a transcription of his inmate appeal concerning the

6   purported ineffectiveness of Tylenol 3 and the medical staff's alleged denials of his requests to

7   see a doctor.  (ECF No. 61-1 at 37-38.)  Plaintiff claims to have provided a copy of this appeal to

8   defendant Okoroike at this time (id.); however, he provides no evidence in the record that this

9   was the case.  Furthermore, these allegations are absent from the written records of plaintiff's

10  treatment in OHU, as well as from the declarations of all defendants and non-party witnesses.

11  Without any factual basis, the court cannot credit plaintiff's statement concerning this purported

12  appeal.  Plaintiff makes this same unsupported allegation concerning other defendants as well

13  (see ECF No. 61-1 at 43), which the court will also not credit for the same reasons.

14  At 10:00, plaintiff was alert, awake, oriented, and verbally responsive.  Plaintiff complied

15  with taking his morning medications and suffered no acute distress.  At 11:50, plaintiff received

16  two Tylenol 3 tablets for his complaints of pain at a level six out of ten.  By 12:50, the medication

17  administration record reflects plaintiff had no further complaints of pain.

18  On March 20, 2010, defendant Mwai was assigned as a registered nurse to the OHU on

19  third watch.  At 17:30, defendant Mwai visited plaintiff's cell and noted he lay resting on his

20  mattress and saw no signs of infection to his wound.  At 18:00, plaintiff requested Tylenol 3 from

21  defendant Mwai.  Upon delivery of the medication, plaintiff got agitated, started shouting, and

22  refused to come to the door to take his medication.  Defendant Mwai noted plaintiff refused his

23  Tylenol 3.  Defendant Auer escorted defendant Mwai on the OHU tiers during pill call.

24  Defendant Auer was on the tier standing near defendant Mwai during his March 20 interaction

25  with plaintiff.  After defendant Mwai left, defendant Auer came to plaintiff's cell, locked the food

26  tray slot through which medication is passed and left.

27  At 19:45, defendant Mwai noted plaintiff refused all evening medications and treatment,

28  but gave no reason for the refusal, was selectively mute, and made poor eye contact.  Defendant

12

Mwai noted plaintiff was not in distress.  On March 20-21, 2010, defendant Molina was assigned as a registered nurse to the OHU on first watch.  At 23:40, defendant Molina provided plaintiff two tablets of Tylenol 3 for pain at a level eight out of ten.  On March 20, 2010, the prison's nursing staff administered to plaintiff all prescribed pain medications.

At 01:00, defendant Molina visited plaintiff's cell.  Defendant Molina noted plaintiff stated he awoke earlier with complaints of pain and that his pain medications had only been briefly effective.  Defendant Molina noted plaintiff stated he had not received a pain evaluation from a doctor and that plaintiff was six days post-operative.  Defendant Molina saw plaintiff had no apparent signs or symptoms of infection and that his surgical site appeared to be healing without complication.  At the time plaintiff was angry, and threatening to file an inmate grievance or lawsuit.  Defendant Molina encouraged plaintiff to talk with the doctor since his prescription had already been increased on March 17, 2010 due to his complaints of pain.  Defendant Molina noted he would inform the nursing staff in the morning of plaintiff's concerns.  Defendant Molina gave plaintiff his prescribed pain medications, but noted plaintiff refused the pain medications the prior evening.  At the conclusion of his shift, defendant Molina noted plaintiff lay sleeping in no apparent distress.  At 08:00, plaintiff's blood pressure was 120/80 and his temperature was 98.8 degrees.

### f.   March 21, 2010

On March 21, 2010, defendant King was assigned as a registered nurse to the OHU on second watch.  At 09:00, defendant King visited plaintiff's cell and noted he was alert, awake, oriented, and verbally responsive.  Defendant King noted plaintiff was angry and stated he had told her on March 19 that the Tylenol 3 was not controlling his pain.  Defendant King responded to plaintiff that he had not informed her of that information.  Defendant King advised plaintiff she would notify the doctor that morning.  Defendant King observed plaintiff's right nasal area incision was healing well with no signs or symptoms of redness, drainage, and swelling.  Plaintiff complied with taking his prescribed medications at that time.  As a result of this interaction, defendant King contacted the doctor that morning.

////

13

1    Throughout his objections to defendants' statement of undisputed material facts, plaintiff

2    repeatedly alleges that before March 21, 2010, he informed the medical staff that his medical

3    records showed that Tylenol 3 was ineffective for treating him.  (See, e.g., ECF No. ECF No. 61-

4    1 at 5, 7, 11, 12, 13, 21.)  These allegations are absent from the written records of plaintiff's

5    treatment in OHU, as well as from the declarations of all defendants and non-party witnesses

6    present for the interactions where plaintiff claims these requests were made.  Plaintiff's only

7    support for these claims is his own declaration and deposition statements.

8    Additionally, plaintiff claims to have repeatedly requested to see a doctor during his stay

9    in OHU before March 21, 2010.  Plaintiff alleges that each time he made the request, defendants

10   and non-defendant medical staff refused him.  (See, e.g., ECF No. 61-1 at 13, 25, 27, 29, 30.)

11   These allegations are also absent from the written records of plaintiff's treatment in OHU, as well

12   as from the declarations of all defendants and non-party witnesses present for the interactions

13   where plaintiff claims these requests were made.  Plaintiff's only support for these claims is his

14   own declaration and deposition statements.

15   Where opposing parties tell two different stories, one of which is "blatantly contradicted"

16   by the record so that no reasonable jury could believe it, the court should not adopt that version of

17   the facts.  Scott v. Harris, 550 U.S. 372, 380 (2007).  Plaintiff's claims about repeatedly

18   requesting to see a physician and asserting to the medical staff that his medical files showed

19   Tylenol 3 to be ineffective are contradicted by the record, such that the court cannot credit his

20   testimony on these points.  "When the non-moving party relies on its own affidavits to oppose

21   summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create

22   an issue of material fact."  Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993).

23   The written notes by the medical staff created contemporaneous with their visits to

24   plaintiff's cell do not record plaintiff's purported requests to see a physician before March 21,

25   2010 and also do not mention plaintiff's allegations that he informed the staff that his medical

26   records show Tylenol 3 is ineffective for his pain.  (See ECF No. 56-2 at 40 (plaintiff's nursing

27   care record from March 21, 2010 shows the first mention of plaintiff requesting a doctor and

28   notifying the nursing staff that the pain medication was not effective at controlling his pain)).

14

Additionally, the declarations of the nursing staff detail their interactions with plaintiff in OHU; consistent with the nursing care written records, the affidavits do not show plaintiff's request for a physician and statements concerning the ineffectiveness of Tylenol 3 until March 21, 2010.  So, while plaintiff submits his own sworn declaration and deposition testimony, these statements are conclusory, self-serving, and blatantly contradicted by all other available evidence.  "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  F.T.C. v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir.1997).  Thus, the court cannot credit these statements as creating a genuine issue of fact concerning plaintiff's interactions with the nursing staff while in OHU.

At 09:55, defendant King paged the on call doctor but did not receive an immediate call back.  As a result, she then contacted the registered nurse who oversees the prison's TTA and requested a phone number to reach the medical officer of the day.  Defendant King called the medical officer of the day and received telephonic physician orders for plaintiff at 10:40.  The on-call doctor issued telephonic physician orders for: (1) Morphine Sulfate Immediate Release fifteen milligrams by mouth every twelve hours as needed for break through pain for five days, and (2) Tylenol 3 two tablets by mouth three times daily for five days.  Defendant King noted the orders.  At approximately 10:45, defendant King administered to plaintiff one tablet of fifteen milligrams of Morphine Sulfate Immediate Release.  Defendant King observed plaintiff had no signs of acute distress after administration of the medication.  At approximately 19:00, the nurse conducting rounds noted plaintiff was awake, took his medications, reported no side effects, and experienced no pain or discomfort at that time.  At 20:00, plaintiff's blood pressure was 148/95 and his temperature was 99.4 degrees.  On March 21, 2010, the prison's nursing staff administered to plaintiff all prescribed pain medications.

### g.   March 22, 2010

At 02:10 on March 22, 2010, the nurse conducting rounds noted plaintiff lay resting quietly at that time after receiving a dose of fifteen milligrams of Morphine Immediate Release at 2400.  The nurse noted plaintiff had no further complaints of pain, his respiration was normal, with no shortness of breath.  At 08:00, plaintiff's blood pressure was 139/92 and his temperature

1    was 98.7 degrees.  At 09:20, plaintiff took his prescribed medication.  Plaintiff complained to the

2    nurse conducting rounds that he had constant pain, that the Tylenol 3 was not working, that he

3    wanted additional pain medication, and wanted to discuss it with the doctor.  Plaintiff then left the

4    OHU at approximately 11:00 to return to U.C. Davis Ear Nose and Throat Clinic for a follow up

5    medical visit to have his sutures removed.

6         The U.C. Davis doctor saw plaintiff for a follow-up visit that day.  Plaintiff complained to

7    the U.C. Davis doctor that Tylenol 3 did not control his pain.  Plaintiff's incision was clean, dry,

8    intact, and with no dehiscence of the wound.  The U.C. Davis doctor removed plaintiff's sutures.

9    Plaintiff's incision showed no signs of infection.  The U.C. Davis doctor prescribed plaintiff one

10   to two tablets of Vicodin, every six hours, as needed for pain; nasal saline; antibiotic ointment;

11   and swabs to clean the incision.  The U.C. Davis doctor recommended plaintiff return in three to

12   four weeks for another follow-up appointment.

13        Plaintiff's medical records reflect he previously had a minor allergic reaction to Vicodin,

14   which caused him to itch.

15        At 12:38, on March 22, 2010, defendant Rigg saw plaintiff in the prison's TTA after he

16   returned from having his sutures removed at U.C. Davis.  When defendant Rigg saw plaintiff in

17   the TTA he was very argumentative, agitated, and verbally threatening.  Plaintiff was adamant

18   that he receive Vicodin.  Defendant Rigg noted that plaintiff was told by U.C. Davis he could

19   have Vicodin for pain but that he had been given Morphine Immediate Release by the prison's

20   doctor every twelve hours and Tylenol 3 three times daily.  Defendant Rigg noted plaintiff stated

21   he has high pain levels in the past and needs his drugs.  Defendant Rigg offered plaintiff

22   Ibuprofen and he refused, stating that he "didn't want it as it won't work."  Defendant Rigg

23   informed plaintiff that his pain medications would be re-evaluated by the doctor and that she

24   could increase the frequency of his prescription of Tylenol 3 to two tablets every six hours as

25   needed for pain.

26        At 12:40 that day, defendant Rigg issued physician's orders for plaintiff to receive two

27   tablets of Tylenol 3 every six hours, as needed for pain, for five days, at an increased frequency to

28   his prior prescription as a substitute for Vicodin.  Defendant Rigg noted that the doctor would re-

16

1     evaluate his pain medications in the morning.

2          In 2010 Vicodin was not on the opioid prison formulary for prescription to inmates

3     without undergoing the non-formulary approval process.  According to her experience a nurse

4     practitioner, defendant Rigg asserts that Tylenol 3 is an equally suitable alternative for Vicodin

5     and is available on the prison formulary.  Defendant Rigg cannot change a prescription to non-

6     formulary without physician approval.

7          At 12:50, the nursing staff administered to plaintiff his noontime medications, and then

8     discharged him from the TTA back to the OHU.  At 1600, plaintiff's blood pressure was 153/104

9     and his temperature was 99 degrees.  At 18:10, the nurse conducting rounds in the OHU noted

10    plaintiff was alert, awake, oriented, had no respiratory distress, no chest pain, and was calm and

11    quiet with staff.  The nurse noted plaintiff was in no acute distress.  On March 22, 2010, the

12    prison's nursing staff offered plaintiff all prescribed doses of Tylenol 3 but he refused to take

13    them.

14                **h.   March 23, 2010**

15          At 01:00 on March 23, 2010, the nurse conducting rounds in the OHU noted plaintiff lay

16    sleeping quietly without asking for any pain medications, and observed no signs or symptoms of

17    acute distress.  At 08:00, plaintiff's blood pressure was 130/90 and his temperature was 98.5

18    degrees.  At 09:30, the nurse conducting rounds in the OHU noted plaintiff was awake, alert,

19    oriented and denying any major discomfort.  Plaintiff refused the Tylenol 3 at that time, stating "it

20    does not work."   At 12:00, plaintiff's blood pressure was 146/98 and his temperature was 99.2

21    degrees.  At 13:00, plaintiff was angry because he was not receiving saline nasal spray.  The

22    nurse noted that nasal spray was not available at that time and that she would follow up.  The

23    nurse provided plaintiff with bacitracin and q-tips.  The nurse noted swelling on the right side of

24    plaintiff's nose.  At 14:00 plaintiff's temperature was 98.5 degrees.

25          At 14:35, defendant Rigg drafted orders in line with the prescription plaintiff received

26    from U.C. Davis for plaintiff to receive saline nasal spray, two puffs each nostril four times a day

27    for seven days; bacitracin ointment twice a day to the surgical site as needed for seven days; and

28    for the provision of sterile 2x2 gauze dressings and swabs at cell side.  At 14:35, the nurse

17

rounding the OHU noted that plaintiff's mood was angry but observed no signs or symptoms of acute distress.  At 17:00, plaintiff's blood pressure was 150/100 and his temperature was 98.5 degrees.

At 17:00, plaintiff complained to the nurse rounding the OHU of pain at his surgical site. Plaintiff refused any administration of Tylenol 3 or Morphine Sulfate Immediate Release stating that "it doesn't help and morphine makes him feel high." (Id.) The nurse noted plaintiff complained of feeling feverish but that his temperate was 98.5 degrees and his blood pressure was 150/100.  At 17:45, the on duty nurse called the medical officer on duty and updated him.  As a result, plaintiff's Tylenol 3 and morphine orders were revised.  At 18:00, the on-call doctor issued telephonic physician's orders for plaintiff to discontinue Morphine Sulfate Immediate Release 15 milligrams and discontinue prior orders for Tylenol 3.  The doctor issued new orders for Kilgore to receive: 1) two tablets of Tylenol 3 every four hours as needed for pain for five days, with a maximum of eight tablets in a twenty-four hour period and 2) fifteen milligrams of Morphine Sulfate extended release by mouth twice a day for five days. (Id.) The OHU nurse noted these orders.  Plaintiff received the extended release morphine that evening, which provided him longer relief from pain.  At 20:00, the nurse rounding the OHU noted plaintiff was calm, medication compliant, and saw no signs of acute distress.  Plaintiff refused to have his blood pressure rechecked at that time.

### i.   March 24, 2010

On March 24, 2010, defendant Molina was assigned as a registered nurse to the OHU on first watch.  At 01:00, defendant Molina visited plaintiff's cell and noted that plaintiff previously appeared to be sleeping but at that time stood quietly at cell door.  Plaintiff did not verbalize any complaints of discomfort or concerns and suffered no apparent distress.  At 08:00, plaintiff's blood pressure was 140/90 and his temperature was 98.4 degrees.

On March 24, 2010, defendant Okoroike was assigned as a registered nurse to the OHU on second watch.  At 09:15, defendant Okoroike visited plaintiff's cell and noted plaintiff was alert and she observed no signs of acute distress.  Defendant Okoroike noted that plaintiff stated "I don't need pain meds, I am not in pain, I will request when I need it."  Defendant Okoroike

advised plaintiff of the difference between scheduled medications and "PRN" medications (as needed).  Plaintiff took the prescribed pain medications after defendant Okoroike provided this explanation. Defendant Okoroike noted plaintiff reported no other issues.

At 09:45, the on-call physician wrote orders discharging plaintiff from the OHU back to C-facility, continuing his current medication, and for him to be seen by a doctor on the med line the next week.  After discharge from the OHU, at approximately 20:05. plaintiff walked to the TTA and was seen by a Licensed Vocational Nurse.  Plaintiff complained of pain and numbness in his nose.  Plaintiff's blood pressure was 147/92 and his temperature was 97.6.  Plaintiff stated the pain was level six out of ten.  Plaintiff also complained of a throbbing headache and stabbing pain in the back of his head, rating his pain at a level seven of ten.

The nurse noted his surgery site had healed and he had no temperature, and no drainage.  The nurse administered plaintiff fifteen milligrams of Morphine Sulfate as ordered for pain.  The nurse noted plaintiff's blood pressure was elevated when he first arrived to the TTA.  The nurse noted plaintiff stated he requested to be discharged from OHU because he wasn't receiving proper care.  The nurse also provided plaintiff an EKG and indicated he would be placed on med line in the morning.  At 20:20, plaintiff returned to his cell, stating his pain was decreasing and he no longer had numbness.  Plaintiff experienced no medical complications after his March 2010 surgery.

Defendant registered nurses Okoroike, Mwai, Molina, and King do not have authority to change a physician's prescription.  Defendant nurse practitioner Rigg cannot change a prescription to a non-formulary medication without physician approval.

**II.     Legal Standard for Summary Judgment**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant.  Crawford–El v. Britton, 523 U.S. 574, 600 (1998); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986); Nw. Motorcycle Ass'n v.

1   U.S. Dep't of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994).  At bottom, a summary judgment

2   motion asks whether the evidence presents a sufficient disagreement to require submission to a

3   jury.

4          The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims

5   or defenses.  Celotex Cop. v. Catrett, 477 U.S. 317, 323-24 (1986).  Thus, the rule functions to

6   "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

7   trial.'"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

8   (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  Procedurally,

9   under summary judgment practice, the moving party bears the initial responsibility of presenting

10  the basis for its motion and identifying those portions of the record, together with affidavits, if

11  any, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477

12  U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  If the moving

13  party meets its burden with a properly supported motion, the burden then shifts to the opposing

14  party to present specific facts that show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);

15  Anderson, 477 U.S. at 248; Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995).

16         A clear focus on where the burden of proof lies as to the factual issue in question is crucial

17  to summary judgment procedures.  Depending on which party bears that burden, the party seeking

18  summary judgment does not necessarily need to submit any evidence of its own.  When the

19  opposing party would have the burden of proof on a dispositive issue at trial, the moving party

20  need not produce evidence which negates the opponent's claim.  See e.g., Lujan v. National

21  Wildlife Fed'n, 497 U.S. 871, 885 (1990).  Rather, the moving party need only point to matters

22  which demonstrate the absence of a genuine material factual issue.  See Celotex, 477 U .S. at 323-

23  24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a

24  summary judgment motion may properly be made in reliance solely on the 'pleadings,

25  depositions, answers to interrogatories, and admissions on file."').

26         Indeed, summary judgment should be entered, after adequate time for discovery and upon

27  motion, against a party who fails to make a showing sufficient to establish the existence of an

28  element essential to that party's case, and on which that party will bear the burden of proof at trial.

See id. at 322.  In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied."  Id. at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case.  Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  Whether a factual dispute is material is determined by the substantive law applicable for the claim in question.  Id.  If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322.

Second, the dispute must be genuine.  In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question.  Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076.  More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented."  Anderson, 477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility.  It believes the opposing party's evidence, and draws inferences most favorably for the opposing party.  See id. at 249, 255; Matsushita, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  American

21

1    Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J.,

2    dissenting) (citing Celotex, 477 U.S. at 322).  If reasonable minds could differ on material facts at

3    issue, summary judgment is inappropriate.  See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th

4    Cir. 1995).  On the other hand, "[w]here the record taken as a whole could not lead a rational trier

5    of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S.

6    at 587 (citation omitted); Celotex, 477 U.S. at 323 (if the evidence presented and any reasonable

7    inferences that might be drawn from it could not support a judgment in favor of the opposing

8    party, there is no genuine issue).  Thus, Rule 56 serves to screen cases lacking any genuine

9    dispute over an issue that is determinative of the outcome of the case.

10          Defendants' motion for summary judgment included a so-called "Rand notice" (ECF No.

11    84-2) to plaintiff informing him of the requirements for opposing a motion pursuant to Rule 56 of

12    the Federal Rules of Civil Procedure.  See Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v.

13    Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999);

14    Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

15    **III.**    **Legal Analysis**

16          Defendants move for summary judgment on plaintiff's Eighth Amendment claims on the

17    following six grounds:

18          (1) Defendants provided plaintiff with appropriate nursing care and dispensed all

19    prescribed pain medication to plaintiff during his recovery from surgery in the CSP-Sacramento

20    OHU; (2) Defendants Okoroike, Mwai, Molina, and King followed the prescribed course of

21    medical treatment for plaintiff and did not have authority to alter his pain medication

22    prescriptions; (3) Defendants did not disregard an excessive risk to plaintiff's health; (4)

23    Plaintiff's allegations amount to a disagreement with the appropriate course of post-operative

24    medical treatment; (5) Defendant Auer (a non-medical correctional officer) reasonably deferred to

25    medical staff to determine plaintiff's appropriate course of medical treatment during his recovery

26    from surgery; and (6) Defendants are entitled to qualified immunity.

27          The court will address each of the arguments below, except for the qualified immunity

28    argument, which need not be reached based upon the court's recommendation to grant summary

1    judgment for all defendants on the merits.

2            A.      __Legal Standards for Deliberate Indifference to Serious Medical Needs__

3            "[D]eliberate indifference to serious medical needs of prisoners constitutes the

4    unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment.  This is true

5    whether the indifference is manifested by prison doctors in their response to the prisoner's needs

6    or by prison guards in intentionally denying or delaying access to medical care or intentionally

7    interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)

8    (internal citations, punctuation and quotation marks omitted).  "Prison officials are deliberately

9    indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere

10   with medical treatment.'"  Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting

11   Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

12           "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

13   further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v.

14   Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v.

15   Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting Estelle, 429 U.S. at 104).  Serious

16   medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find

17   important and worthy of comment or treatment; the presence of a medical condition that

18   significantly affects an individual's daily activities; [and] the existence of chronic and substantial

19   pain."  McGuckin, 974 F.2d at 1059-60.

20           To prevail on a claim for deliberate indifference to serious medical needs, a prisoner must

21   demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health

22   or safety; the official must both be aware of the facts from which the inference could be drawn

23   that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v.

24   Brennan, 511 U.S. 825, 837 (1994).

25           "In the Ninth Circuit, the test for deliberate indifference consists of two parts.  First, the

26   plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's

27   condition could result in further significant injury or the unnecessary and wanton infliction of

28   pain.  Second, the plaintiff must show the defendant's response to the need was deliberately

                                                    23

1     indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or failure to

2     respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."

3     Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation

4     marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v.

5     CDCR, 726 F.3d 1062, 1081 (9th Cir. 2013).

6         "The indifference to a prisoner's medical needs must be substantial.  Mere 'indifference,'

7     'negligence,' or 'medical malpractice' will not support this claim.  Even gross negligence is

8     insufficient to establish deliberate indifference to serious medical needs."  Lemire, 726 F.3d at

9     1081-82 (internal citations, punctuation and quotation marks omitted); accord, Cano v. Taylor,

10     739 F.3d 1214, 1217 (9th Cir. 2014).  Moreover, "[a] difference of opinion between a physician

11     and the prisoner -- or between medical professionals -- concerning what medical care is

12     appropriate does not amount to deliberate indifference."  Snow v. McDaniel, 681 F.3d 978, 987

13     (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989)).

14         Whether a defendant had requisite knowledge of a substantial risk of harm is a question of

15     fact.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very

16     fact that the risk was obvious.  The inference of knowledge from an obvious risk has been

17     described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the

18     burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue

19     of their having turned a blind eye to facts or inferences strongly suspected to be true[.]"  Coleman

20     v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-43) (internal

21     quotation marks omitted).

22         When the risk is not obvious, the requisite knowledge may still be inferred by evidence

23     showing that the defendant refused to verify underlying facts or declined to confirm inferences

24     that he strongly suspected to be true.  Farmer, 511 U.S. at 842.  On the other hand, prison officials

25     may avoid liability by demonstrating "that they did not know of the underlying facts indicating a

26     sufficiently substantial danger and that they were therefore unaware of a danger, or that they

27     knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise

28     was insubstantial or nonexistent."  Id. at 844.  Thus, liability may be avoided by presenting

1   evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable

2   in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298

3   (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

4         **B.**     **Defendants' Administration of Nursing Care and Prescription Medication**

5              **1.**     **Registered Nurse Defendants Okoroike, Mwai, Molina, and King**

6       Plaintiff alleges that registered nurse defendants Okoroike, Mwai, Molina, and King

7   ignored his complaints that Tylenol 3 was ineffective, did not respond to his requests to see a

8   doctor, made plaintiff wait until pill call to receive pain medications, and continued to provide

9   plaintiff with ineffective pain treatment thereafter.  As demonstrated in the undisputed facts

10   above, however, the registered nurse defendants did not ignore plaintiff's complaints.  Instead,

11   they consulted with physicians when circumstances warranted, and followed proper procedures

12   and the orders of physicians concerning the distribution of pain medication.  Furthermore, the

13   registered nurse defendants had no authority to alter plaintiff's prescriptions on their own.

14       In February of 2007, plaintiff had a similar sinus operation, after which, he recovered in

15   the prison's OHU under similar circumstances.  (ECF No. 43 at 95.)  Based upon his post-

16   operative care from that surgery, plaintiff contends that it is clear from his medical records that

17   Tylenol 3 is an ineffective medication for controlling his pain and that he must be administered

18   alternative pain medications.  (Id. at 5.)  Plaintiff directs the court to a single line in a treatment

19   note from his U.C. Davis Medical Center chart dated March 3, 2007.  (Id.)  On February 28,

20   2007, plaintiff was prescribed Tylenol for his post-operative pain, but three days later, on March

21   3, 2007, morphine and MS Contin were ordered to address the pain.  (Id. at 102.)  In addition to

22   changing the medication, the physician noted that "pain not controlled by oral meds."  (Id.)

23   Plaintiff claims this note establishes Tylenol 3 as a wholly inadequate treatment for his pain at all

24   times and that medical professionals who do not abide by this note are deliberately indifferent to

25   his medical needs.  This is inaccurate on several fronts.

26       First, as the court explained in the statement of facts, plaintiff offers no support for his

27   allegations that he repeatedly informed the nursing staff from the time of his arrival until March

28   21, 2010 that Tylenol 3 was an inappropriate medication based on his medical records and that he

needed to see a physician.  (See supra, pp. 13-15.)  As demonstrated above, the court cannot

credit these unverified allegations that are contradicted by the record.

Second, the record is clear that the registered nurse defendants provided plaintiff with his

pain medication in the dosage and frequency prescribed by the physicians.  While plaintiff claims

that the nurses ignored his pleas for new medication and consults with physicians, it is

indisputable that the nursing staff regularly attended to their rounds in OHU and ATT,

administered medication per the protocol, and assessed plaintiff's medical state.  (See ECF No.

56-2 at 25-46.)

For example, the records from March 17, 2010 through March 18, 2010 show that he was

visited by nursing staff a total of nine times.  (Id. at 26-29.)  Significantly, during his first evening

in OHU (March 17, 2010), the nurse on duty took note of plaintiff's pain and called the on-call

physician to express that the prescribed dosage of Tylenol 3 was not controlling plaintiff's pain.

(Id. at 27.)  The physician on call, Dr. Ma, ordered that the dosage of Tylenol 3 be increased from

1 tab every four hours to 2 tabs every six hours.  (Id. at 14.)  Additionally, on the morning of

March 18, 2010, plaintiff expressed more concern about his pain medication.  (Id. at 29.)  The

nurse made note of the concern and then, less than three hours later, the on-call physician ordered

the nursing staff to administer fifteen milligrams of immediate release morphine by mouth one

time for postoperative pain.  (Id. at 14.)  The nursing staff provided the medication per these

instructions.  (Id. at 29.)  That evening, plaintiff reported that his pain was more controlled.  (Id.)

As the statement of facts demonstrates in great detail (supra, pp. 10-19), this pattern

repeated over the course of plaintiff's stay in OHU.  From March 16, 2010 through March 24,

2010, the nurses visited plaintiff's cell routinely where they provided him with medication,

assessed his current condition, and monitored his temperature and blood pressure.  (Id. at 25-46.)

When prompted by plaintiff's complaints of discomfort and pain, the nursing staff contacted the

physicians on call and provided them with relevant information.  (See id. at 15-17, 29, 40-46.)  In

addition to the aforementioned occasions on March 17 and 18, 2010, plaintiff's pain medication

was altered three more times, March 21, 22 and 23, 2010.  (Id. at 15-17.)  These alterations in

treatment were all prompted by plaintiff's expressions of concern to the nursing staff who then

1  promptly notified the on-call physicians.  (Id. at 40-46.)

2         Finally, as registered nurses, these defendants do not have authority to change any of

3  plaintiff's medications.  The record clearly demonstrates that the registered nurse defendants

4  administered the medications prescribed by those with authority to do so and that they promptly

5  passed relevant information about plaintiff's condition to those with authority to prescribe

6  medication.  The law cannot impose liability upon these defendants for adhering to the

7  prescriptions issued by the physicians when they passed upon all relevant information to the

8  physicians on call.  In a similar lawsuit filed by plaintiff in 2007 related to his 2007 surgery and

9  post-operative care, this court granted summary judgment in favor of a vocational nurse partially

10  based upon similar grounds.  See Kilgore v. Mandeville, No. 2:07-cv-2485, ECF No. 151 at 48-49

11  (E.D. Cal. Feb. 21, 2014).  There, the court found that "plaintiff has failed to state an Eighth

12  Amendment claim based on [the nurse's] alleged later adherence to [the doctor's] reduced

13  Percocet prescription[.] . . . As explained by [the doctor], and undisputed by the parties, nurses do

14  not have the authority to change a physician's prescription."  Id. at 49.

15         Finally, even if the court were to accept that the notation in plaintiff's 2007 medical

16  record meant that the treating physician opined that Tylenol 3 was **always** inadequate for treating

17  plaintiff, this is not conclusive evidence that any future physician prescribing Tylenol 3 to treat

18  plaintiff's pain is acting with deliberate indifference to his medical needs.  Nor would this impute

19  any deliberate indifference on the medical professionals administering such medication on a

20  doctor's orders.  A difference of opinion between medical professionals concerning the

21  appropriate course of treatment generally does not amount to deliberate indifference to serious

22  medical needs.  Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891

23  F.2d 240, 242 (9th Cir. 1989).

24         Thus, if the court were to accept plaintiff's version of the facts where he repeatedly

25  directed the nursing staff to abide by this note (and even if the court were to accept that directing

26  nursing staff with no authority to change his medication was an effective means of putting them

27  on notice that his medication should be changed), the treating physicians in 2010 were free to

28  disagree with that note and pursue different methods for addressing plaintiff's pain.  A single note

27

1 concerning the ineffectiveness of a single treatment on a single day for a specific condition is not

2 held as controlling over all future physicians.

3       To establish that such a difference of opinion amounted to deliberate indifference, the

4 prisoner "must show that the course of treatment the doctor[] chose was medically unacceptable

5 under the circumstances" and "that [the doctor] chose this course in conscious disregard of an

6 excessive risk to [the prisoner's] health." Jackson, 90 F.3d at 332.  Plaintiff makes no such

7 demonstration here.  Plaintiff's only support for his claims that the OHU medical staff were

8 deliberately indifferent are his own complaints of pain and the fact that the doctors disagreed

9 three years apart.  Plaintiff does not present any medical or scientific sources that demonstrate

10 that the physicians who issued prescriptions in 2010 acted in a way that was "medically

11 unacceptable."

12       To prevail on a deliberate indifference claim, plaintiff is burdened with demonstrating a

13 "failure to respond to a prisoner's pain[.]"  Jett, 439 F.3d at 1096.  The record here only reflects a

14 disagreement between his treating physicians in 2010 -- who repeatedly addressed plaintiff's

15 complaints with adjustments to the course of treatment -- and a single note from another doctor

16 written three years prior concerning a different surgery.  This is inadequate to survive summary

17 judgment.  Defendants Okorioke, Mwai, Molina, and King are all registered nurses with no

18 authority to alter a patient's medications; they conducted their rounds as scheduled; they assessed

19 plaintiff's physical condition; they administered plaintiff's medications; and they took note of

20 plaintiff's complaints and passed that information along to on-call physicians who had authority

21 to adjust treatments.  Thus, the record demonstrates that plaintiff cannot support a claim for

22 deliberate indifference against these defendants.

23       For these reasons, summary judgment should be granted for defendants Okorioke, Mwai,

24 Molina, and King.

25          **2.**      **Nurse Practitioner Defendant Rigg**

26       Plaintiff alleges that nurse practitioner defendant Rigg failed to provide him with sterile

27 cleaning supplies and Vicodin, failed to attend to his pain, and failed to call a doctor to provide

28 treatment.

1    First, despite plaintiff's allegations otherwise, the record is clear that plaintiff's wound

2    was monitored and treated with sterile supplies during his stay in OHU.  While defendant Rigg,

3    as the nurse practitioner, did not perform the routine rounds to provide plaintiff with wound care

4    and administer his medication, she did prepare plaintiff's post-operative care plan.  (ECF No. 56-

5    2 at 9-10.)  Defendant Rigg prepared the plan after conducting a complete history and

6    examination of plaintiff.  (Id.)  The plan was consistent with U.C. Davis' orders, including

7    Keflex, nasal spray, dry sterile dressings, a 50% hydrogen peroxide solution for cleaning the

8    wound, one tablet of Tylenol 3 every four hours (in the initial plan; as noted above, this was

9    adjusted as needed), and medication for constipation.  (ECF Nos. 55-7 at 3; 56-2 at 9-10)  In

10   carrying out this plan, the medical staff routinely visited plaintiff's cell, assessed the progress of

11   his healing, and administered his medication.  (ECF No. 56-2 at 25-46.)

12   Furthermore, plaintiff did not suffer any consequences concerning the treatment of his

13   wound.  No infections or pain are reported in the record as a result of anything related to the

14   cleaning supplies for plaintiff's surgical wounds.  While plaintiff's claims center upon treatment

15   for his pain, there is no connection made between the allegation of non-sterile supplies and post-

16   operative pain from the surgical incisions. Accordingly, plaintiff cannot sustain an action against

17   defendant Rigg concerning the cleaning supplies for his wounds.

18   As opposed to the registered nurse defendants, defendant Rigg, as a nurse practitioner, can

19   write prescriptions.  Plaintiff alleges that defendant Rigg discarded his Vicodin prescription

20   issued by U.C. Davis Medical Center when he was discharged and replaced it with Tylenol 3,

21   which he asserts is a wholly ineffective medication.  Defendant Rigg counters that she did not

22   throw away or discard the Vicodin prescription in the manner that plaintiff claims.  (ECF No. 55-

23   7 at 3-4.)  Regardless of the manner, however, defendant Rigg did replace the Vicodin

24   prescription with Tylenol 3, which, according to her professional medical opinion, was a suitable

25   substitute for Vicodin.  (Id.)

26   In 2010, Vicodin was not on the opioid prison formulary for prescription to inmates

27   without undergoing the non-formulary approval process.  (Id.)  Accordingly, defendant Rigg

28   wrote plaintiff a prescription for an alternative, Tylenol 3.  A difference of opinion between

1   medical professionals concerning the appropriate course of treatment generally does not amount

2   to deliberate indifference to serious medical needs.  Toguchi, 391 F.3d at 1058.  And to establish

3   that such a difference of opinion amounted to deliberate indifference, the prisoner "must show

4   that the course of treatment the doctor[] chose was medically unacceptable under the

5   circumstances" and "that [the doctor] chose this course in conscious disregard of an excessive

6   risk to [the prisoner's] health."  Jackson, 90 F.3d at 332.

7         As the court discussed above, plaintiff makes no such demonstration here.  The only

8   evidence on the record is of a medical professional (defendant Rigg) stating that Tylenol 3 is a

9   suitable alternative to Vicodin and that the prison did not have Vicodin available to inmates on a

10   regular basis.  (ECF No. 55-7 at 3-4.)  Additionally, despite plaintiff's protestations otherwise, his

11   medical records are clear that he suffers an allergic reaction to Vicodin.  (ECF No. 56-2 at 91,

12   96.)  This court, in its findings and recommendations concerning plaintiff's previous case, also

13   found that plaintiff is allergic to Vicodin.  Kilgore v. Mandeville, No. 2:07-cv-2485, ECF No. 151

14   at 14 (E.D. Cal. Feb. 21, 2014).  This weighs further in favor of defendant Rigg's judgment in not

15   providing plaintiff with Vicodin (if she actually could provide it).  Plaintiff's own sworn

16   statements and unsupported allegations of wrongdoing cannot overcome these essential facts and

17   no jury could find deliberate indifference on this basis.

18         As with the registered nurse defendants, defendant Rigg has shown that she sufficiently

19   attended to plaintiff's needs in the OHU.  The court discussed above how plaintiff's concerns

20   were taken into account during his recovery and variations of pain medications available within

21   the prison were administered to plaintiff to ease his pain.  Plaintiff's treatment occurred over nine

22   days, during which doctors modified his pain medication five times to address his complaints of

23   pain and discomfort.  (ECF No. 56-2 at 15-17.)  The record is clear that defendant Rigg

24   appropriately developed a treatment plan, physician orders, and administered the prescribed

25   course of treatment.

26         For these reasons, summary judgment should be granted for defendant Rigg.

27   ////

28   ////

3.    **Defendant Correctional Officer Auer**

Plaintiff alleges that defendant correctional officer Auer did not respond to his complaints that the Tylenol 3 ineffectively controlled his pain and that he wanted to see a doctor.  (ECF No. 12 at 28.)

The undisputed facts concerning defendant Auer are that he escorted defendant Mwai on the OHU tiers during pill call on March 20, 2010.  Defendant Auer was on the tier standing near defendant Mwai during his interaction with plaintiff.  After defendant Mwai left, defendant Auer came to plaintiff's cell, locked the food tray slot through which medication is passed and left.  At 19:45, defendant Mwai noted plaintiff refused all evening medications and treatment, but gave no reason for the refusal, was selectively mute, and made poor eye contact.  (ECF No. 56-2 at 38.) Defendant Mwai noted plaintiff was not in distress.  (Id.)

In his 2007 lawsuit, plaintiff made similar allegations against a correctional officer, for which, the court entered summary judgment for the defendant.  Kilgore v. Mandeville, No. 2:07-cv-2485, ECF No. 151 at 47 (E.D. Cal. Feb. 21, 2014).  As in that case, the undersigned also finds that "[i]t is undisputed that a correctional officer is unqualified to make a medical diagnosis or decision, and is required to defer to medical staff concerning the medical care of prisoners."  Id. Defendant Auer was merely present during pill call and observed the interaction between plaintiff and defendant Mwai, a registered nurse.  The court finds no reasonable inference based on the evidence that defendant Auer knew of or disregarded an excessive risk of serious harm to plaintiff by adhering to the decision defendant Mwai to close plaintiff's food tray slot and leave him after plaintiff refused his medications that evening.  As a correctional officer, defendant Auer reasonably and appropriately deferred to the professional medical staff member present who was dealing with plaintiff's medical needs.

For these reasons, summary judgment should be granted for defendant Auer.

IV.    **Conclusion**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.    Defendants' motion for summary judgment (ECF No. 55) be granted; and

2.    Summary judgment be granted in full on behalf of defendants Okorioke, Mwai,

31

1  Molina, King, Rigg, and Auer.

2          These findings and recommendations are submitted to the United States District Judge

3  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

4  after being served with these findings and recommendations, any party may file written

5  objections with the court and serve a copy on all parties.  Such a document should be captioned

6  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

7  objections shall be filed and served within fourteen days after service of the objections.  The

8  parties are advised that failure to file objections within the specified time may waive the right to

9  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

10  Dated:  March 2, 2017

11

12

13                                              DEBORAH BARNES
                                         UNITED STATES MAGISTRATE JUDGE

14  TIM-DLB:10
    DB / ORDERS / ORDERS.PRISONER.CIVIL RIGHTS / kilg.1745.msj

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              32